# St. Johnsbury & L.C.R.R. v. Skeels & Weidman, Inc.

[196 A.2d 485]

October Term, 1963

Present: Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.

Opinion Filed December 3, 1963

*Downs & Rachlin* for the plaintiff.

*Carl S. Gregg* for the defendant.

**Holden, J.** The defendant corporation is a feed and grain dealer in Swanton, Vermont. Sometime in October 1956 the defendant's president, Skeels, received a call from a broker in Canada offering

to sell a carload of grain consisting of two hundred 100-pound bags of bran and three hundred 100-pound bags of reground oat feed. The defendant did not know from what source the broker would procure the shipment nor where it would originate.

On the morning of October 19, 1956, the plaintiff's agent at Swanton notified the defendant that a carload of grain had arrived and been switched to the defendant's siding. The agent testified that he knew the car was destined for the defendant from instructions contained in a list which had been made up for the train switcher, indicating that the car should be spotted on the defendant's spur. Upon this information alone the agent released the car to the defendant and the shipment was unloaded.

Three days later Skeels went to the Chittenden County Trust Company at Swanton and gave the bank the defendant's check in the amount of $801.50 in payment of a demand draft in the same amount, drawn by Quebec Feed and Grain, Ltd. The instrument was dated September 24, 1956, and was directed to the defendant at the Chittenden County Trust Co. at Swanton. The instruction "Documents on payment only—Delivery order #377" was typed on the draft.

Upon payment of the bill, the defendant received from the bank an instrument which contained this writing:

"No. 377                                           September 24, 1956
      St. Johnsbury & Lamoille County R.R.,
      Swanton, Vt.
      Please deliver to Bearer Skeels & Weidmann
      Car shipped ex Peterborough, Ont., Containing 200x100's
      Bran 300x100's Reground Oatfeed
      and charge same to account of /s/ Quebec Feed & Grain Ltd."

This instrument was stamped "Paid—Oct. 22 1956 Swanton Bank Division Chittenden County Trust Co." The defendant delivered this paper to the plaintiff. During the next few weeks the grain was sold at retail.

Nothing further about this transaction was communicated to the defendant until a year later. At that time it developed that the shipment in question was subject to an order bill of lading that had been issued by the Canadian Pacific Railway to the Quaker Oats

Company of Canada, Limited. The bill was dated October 12, 1956 and identified the shipment as "200 Sax 100J BC Bran" and "300 Sax 100J Peterborough Oat Mill By Prod," consigned to the order of Quaker Oats Company. The bill of lading stated the destination was Swanton over the Canadian Pacific and the St. Johnsbury and Lamoille County railroads. It is provided in the bill that "The surrender of this Original Order Bill of Lading properly endorsed shall be required before the delivery of the goods." The whereabouts of the order bill of lading during the intervening year does not appear. However, during this time the Quebec Feed & Grain, Ltd. went into bankruptcy. Apparently Quaker Oats was not paid for the grain and the plaintiff has reimbursed the shipper for the loss by payment of $735.51 on February 13, 1958.

The following July the railroad instituted this action to recover the amount it has paid the Quaker Oats Company. The complaint alleged three grounds for recovery. The first count alleges an assignment of the claim by Quaker Oats; the second claims in tort for an alleged conversion of the shipment by the defendant. The final count charges a breach of contract. The claim based on assignment was withdrawn during the trial. At the close of the plaintiff's evidence, both parties moved for directed verdicts on the remaining counts. The plaintiff's motion was denied; the defendant's motion was granted. From the judgment for the defendant which followed, the plaintiff brings this appeal.

Error is assigned to the trial court's ruling as to both aspects of its complaint. The plaintiff contends its evidence established a prima facie right to recover in either conversion or contract.

The real question is whether the plaintiff carrier can transfer the burden of its liability for misdelivering the grain, to one who, in good faith, has received and paid for the shipment.

■ The loss which the plaintiff seeks to retrieve was imposed upon the carrier by statute. In legal theory, it can be justified in tort for conversion or negligence. It is equally supported on principles of contract as a violation of the bailment agreement. Since the adoption of the Uniform Bills of Lading Act, these considerations are relatively unimportant as between the holder and the carrier. According to this enactment the plaintiff was liable to Quaker Oats as

the holder of the bill, for having failed to deliver according to the order of the consignee. 9 V.S.A. §§962-963; *Quigley* v. *Wiley*, 107 Vt. 253, 259, 179 Atl. 206.

As between the shipper and the carrier, the form in which the present bill was written was conclusive of Quaker Oats' title to the goods. But the title of the shipper-consignee was not absolute. Since the grain was shipped pursuant to an order of purchase, "the seller's property in the goods shall be deemed to be only for the purpose of securing performance by the buyer of his obligation under the contract." 9 V.S.A. §1013(2); 2 Williston, Sales §284 (Rev. Ed.). The Uniform Sales Act is to the same effect. 9 V.S.A. §1520(b); See also *Bondi Bros.* v. *Holbrook Grocery Co.*, 96 Vt. 160, 167, 118 Atl. 486.

Clearly it was the intention of Quaker Oats, as the seller, to transfer title to the defendant upon receipt payment of the purchase price. And it is of some significance that the risk of spoilage and deterioration of the goods was in the defendant. *Standard Casing Co.* v. *California Casing Co.*, 233 N. Y. 413, 135 N.E. 834, 835; 2 Williston Sales §284 (Rev. Ed.).

By making a compulsory payment to the seller for unlawfully impairing its security for the purchase price, the plaintiff seeks to enjoy all of the possessory rights conferred upon Quaker Oats by the original carrier in the issuance of the bill of lading.

In support of this claim, the plaintiff places reliance on the decision of the Supreme Judicial Court of Massachusetts in *New York Central Railroad Co.* v. *Freeman*, 240 Mass. 200, 133 N.E. 101. There, too, a misdelivery by the carrier to the buyer was involved. The defendant had contracted with the seller for the purchase of arc lights and paid part of the price. The defendant directed the seller to ship the goods by rail, "sight draft attached to bill of lading." The initial carrier issued its order bill of lading, specifying the shipper as both consignor and consignee, with direction to the terminal carrier to notify the defendant. The defendant was notified by the drawee bank that it held the seller's sight draft and bill of lading. The defendant did not pay the draft nor take up the bill. By reason of some omission on the part of the railroads involved, the way bill did not indicate that the shipment was subject to an outstanding bill of lading which

required surrender before delivery of the shipment. Taking advantage of this shortage, the defendant obtained delivery of the lights without paying the draft. The carrier responded to the holder of the bill.

The opinion of the court, in justifying a verdict for conversion, points to three important factors that are not available to the plaintiff in the present case. The defendant had never paid the balance due on the purchase price to anyone. The defendant knew that he was not entitled to accept delivery without paying the sight draft which he had instructed the seller to transmit. And he knew the carrier was unauthorized to make the delivery and was in violation of its obligation to the shipper in so doing. *New York Central Railroad Co.* v. *Freeman, supra,* 133 N.E. at 103, 104. An additional consideration is apparent in the fact that the denial of a recovery on such evidence would have left the defendant unjustly enriched at the expense of the carrier.

The present defendant stands differently. He accepted delivery and parted with full consideration, in what he thought to be a lawful discharge of his obligation for the purchase price. This course of conduct was followed without any knowledge on his part of the security interest of the Quaker Oats Company, and without notice that the carrier was violating its undertaking to the holder of the bill. Of parallel importance is the fact that the dominion exercised by the defendant was done at the plaintiff's invitation, at a time when its agent knew, or should have known, the true status of the shipment.

■ The bill of lading issued by the initial carrier expressed not only the agreement of carriage, but also served as a document of title. In its latter function, it was conclusive between the consignor and the carrier and bona fide holders of the instrument. But that does not mean that the buyer, who had no knowledge of the bill, could acquire no rights of property in the grain, independent of the bill. 2 Williston, Sales §286 b (Rev. Ed.).

The defendant, in paying the broker's draft, did not undertake to purchase the property interest of Quaker Oats. He sought to pay the broker his price for the grain. So we cannot say, as the carrier contends, that the first mistake in this series of events can be assigned to the defendant. For all we can find in the record, there is nothing to indicate the payment of the broker's draft was not a proper satis-

faction of the defendant's obligation as purchaser, depending of course on the broker's position as to the seller and buyer.

However this may be, the defendant stands in the position of an innocent purchaser of the shipment who has paid value for its possession. And even if it can be said that the seller's price has been satisfied by the plaintiff's settlement of the shipper's claim, the defendant has gained no unjust enrichment.

Both parties have become involved in this misadventure by mistake. But for the plaintiff's negligent discharge of its duties as a carrier according to the instrument upon which it now stakes its right to recover, the defendant would not have been misled into honoring the broker's draft. In this situation we think the defaulting carrier should bear the loss. *Chicago Great Western R.R.* v. *Lowry,* 119 Kan. 336, 239 P. 758; *Norfolk So. R.R.* v. *Barnes,* 104 N.C. 25, 10 S.E. 83, 5 L.R.A. 611. See also comment in 39 Harv. L. Rev. 504; 24 Mich. L. Rev. 484.

This result must follow unless the plaintiff has gained superior rights and interest by way of subrogation. In its brief the railroad contends it stands in the seller's shoes. But this action was not instituted to protect the possession or interest of its bailor. In essence, its claim is one of subrogation, to recoup a loss it has sustained by reason of its impairment of the bailor's security interest in the shipment.

██ Subrogation will not be enforced to the prejudice of rights of equal or higher rank. Insofar as the delivery was wrongful, the plaintiff was the first participant. It would be manifestly unjust to permit the plaintiff to extricate itself from the consequences of its delinquency toward the shipper by shifting the burden to the defendant by requiring it to pay twice for the shipment. *Iby* v. *Wrisley,* 104 Vt. 148, 153, 158 Atl. 67. See also *Greer* v. *Equity Cooperative Exchange,* 137 Minn. 300, 163 N.W. 527, L.R.A. 1917F, 440, 443; 13 C.J.S. Carriers §173, p. 343; 9 Am. Jur. Carriers, §554; 53 Am. Jur. Trover and Conversion §§82-83.

The plaintiff's claim in 'contract is based upon prior dealings between the parties. It appears in the evidence that it had been the custom of the railroad to place cars at the defendant's siding and notify the defendant of the arrival and that a bill of lading would be required before the shipment could be delivered. Frequently, however,

the shipment was released, as here, before the bill was actually produced. The reason for this practice was that occasionally a shipment arrived at times when the bank was not open and the defendant could not procure the bill by payment of the accompanying draft. From this custom and usage, the plaintiff contends there was an implied agreement by the defendant to produce the bill in favor of Quaker Oats and its failure to do so constituted a breach of contract.

The record reveals no express agreement to this effect on the part of the defendant. Neither was there any understanding between the parties that this shipment was subject to a bill of lading. Skeels testified that his company received between 75 and 100 grain shipments through the year. Not all were subject to bills and some were on open account that involved no bills of lading.

Neither does it appear that the plaintiff's release of the grain was done exclusively for the defendant's accommodation. It appears that the notice of arrival and the transfer of possession were instigated by the railroad.

■ It is doubtful that an agreement by the defendant to produce the bill of lading in favor of Quaker Oats can be inferred, since it is undisputed that the defendant had no knowledge that such a bill was outstanding. In any event, the defendant produced the receipted delivery order which was attached to the draft. This was the only documentation then available and was given by the bank as a proper acquittance. It was accepted as such by the plaintiff at the time. If this was unsatisfactory performance of its undertaking, the plaintiff failed to make known this fact for more than a year afterward. In the meantime, any opportunity of the plaintiff to correct the mistake was irretrievably lost. However this may be, the fact remains that the loss suffered by the plaintiff, for which recovery is sought in this action, was not occasioned by the defendant's failure to return the bill of lading. The true cause of the carrier's damage has been its own departure from the uniform act and the violation of its undertaking with the shipper.

On the facts presented there was no issue for the jury. The order directing the verdict for the defendant was well founded.

*Judgment affirmed*